**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

**BILLY DODSON**                                                                                             **PLAINTIFF**

**vs.**                      **Case No. 4:03-CV-00983 GTE**
                                  **Consolidated With:**
                                  **Case No. 4:03-CV-00984 GTE**
                                  **Case No. 4:04-CV-00601 GTE**

**JACK FITZHUGH, CHRIS HUGGINS,**
**JACKIE DAVIS, JOHN DODD, DENNIS**
**SANDERSON, and THE CITY OF CABOT,**
**ARKANSAS**                                                                                 **DEFENDANTS**

**ORDER GRANTING SUMMARY JUDGMENT**
**TO CITY OF CABOT DEFENDANTS**

Before the Court is a Motion for Summary Judgment filed by Defendants Jackie Davis, Cabot, Arkansas, John Dodd, Edward Sims, Jr., Jack Fitzhugh, Roger Tonnessen, and Chris Huggins (hereinafter, collectively, the "City of Cabot Defendants") in this case. The same Defendants also filed a Motion to Dismiss, which the Court considers moot given the filing of the summary judgment motion. Plaintiff, proceeding *pro se*, filed a statement of material facts responding to the allegations of material fact presented by the County Defendants.

On June 2, 2006, Separate Defendant Dennis Sanderson filed a motion to join in the City of Cabot Defendants' summary judgment motion, contending that if the City of Cabot Defendants are entitled to judgment of law, then so is he. The Court granted that motion, thereby permitting Dennis Sanderson to join in the City of Cabot Defendants' Motion for Summary Judgment. The Court permitted Plaintiff until Thursday, June 15, 2006, to oppose Mr. Sanderson's request for summary judgment. It is premature to rule on Mr. Sanderson's motion since June 15th has not yet passed. However, in light of the impending trial date, the Court has

elected to issue this opinion. Plaintiff's claims against Mr. Sanderson – which relate only to the alleged illegal nighttime search – will be taken up after the Plaintiff's deadline to oppose the motion has passed.

For the reasons stated herein, the Court concludes that all of the City of Cabot Defendants are entitled to judgment as a matter of law.

## OVERVIEW OF PLAINTIFF'S CLAIMS

Plaintiff filed three separate lawsuits in federal court. All of the lawsuits were consolidated as related cases and assigned to this Court, after which all pleadings were filed only in the lead case – Case No. 4:03-CV-983. (See Order of April 7, 2005, Docket No. 37). In this Order, all references to other Orders or to Docket Number entries refer to the lead case unless otherwise stated. The Court will describe all of Plaintiff's three cases.

### (1)     Lead Case – Case No. 4:03-CV-983 GTE

Plaintiff's Amended Complaint filed in the lead case, 4:03-CV-983 GTE, contains claims for false arrest and an unreasonable search against the following Defendants: Officer Jack Fitzhugh, Detective Chris Huggins, Cabot Chief of Police Jackie Davis, Detective John Dodd, Investigator Dennis Sanderson, and the City of Cabot. The Court dismissed the false arrest claim pursuant to *Heck v. Humphrey*, 512 U.S. 477 (1994). (*See* Order of June 25, 2004, Docket No. 8). Thus, the sole claim remaining from the Amended Complaint filed in the lead case relates to an alleged illegal search of Plaintiff's residence – actually, two searches. Plaintiff alleges that Officer Fitzhugh conducted an illegal sweep for weapons or persons prior to the actual search of the residence. Subsequently, Officer Dodd returned with a search warrant. Plaintiff contends that Officer Dodd, accompanied by Officers Fitzhugh, Huggins, and Sanderson, conducted a search of Plaintiff's residence at approximately 8:35 p.m. Evidence obtained in the search was

used to convict Plaintiff of drug related criminal charges in Arkansas state court.

Thus, Plaintiff's remaining claims in the lead case concern two allegedly illegal searches. Plaintiff has sued all of the officers involved in said searches as well as Cabot Police Chief Jackie Davis and the City of Cabot.  Plaintiff contends that the City of Cabot has a custom or policy of allowing its officers to make false charges and to conduct illegal searches.  Plaintiff seeks an award of compensatory damages from each Defendant.

### 2.    Second Case - Case No. 4:03-CV-00984

Plaintiff filed a second lawsuit, assigned Case No. 4:03-CV-00984 on the same day he filed the lead case.  In that lawsuit, which was randomly assigned to The Honorable William Wilson, Plaintiff made claims against various officials of the Cabot Police Department contending that they violated his constitutional rights by using excessive force in connection with his arrest and while Plaintiff was in custody and handcuffed to a metal bench.  Certain of these claims were dismissed by Judge Wilson.  Judge Wilson permitted Plaintiff's claims against Defendants Sims, Fitzhugh, and Tonnessen to go forward.  (*See* Court's Order of April 27, 2004, adopting Partial Recommended Disposition of April 5, 2004, filed in Case No. 4:03-CV-00984).

### 3.    Third Case - Case No. 4:04-CV-00601

Plaintiff also filed a third lawsuit, assigned Case No. 4:04-CV-601, against the City of Cabot and the Lonoke County Sheriff's officials, therein alleging that he was deprived of a prompt first appearance, subjected to excessive bail, and denied legal representation at the first appearance.  The Court ruled previously on Plaintiff's claims against the County Defendants. *(See* Court's Order dated March 29, 2006, Docket No. 104).  Only Plaintiff's claims against Cabot Police Chief and the City of Cabot remain.

## PLAINTIFF'S STATE CONVICTION AND REVERSAL

Evidence obtained from the allegedly unlawful search of Plaintiff's home was used to convict Plaintiff of manufacturing methamphetamine, possession of drug paraphernalia with intent to manufacture methamphetamine, and possession of methamphetamine with intent to deliver. As a result of these convictions, Plaintiff was sentence to ten years in prison.

On December 1, 2004, the Arkansas Court of Appeals overturned Plaintiff's criminal conviction based upon its conclusion that the search of Plaintiff's home violated Arkansas Rule of Criminal Procedure 13.2 because it was conducted at night. *Dodson v. State*, __ S.W.3d __, 88 Ark. App. 380 (Ark. App. 2004).

## FACTS WITHOUT MATERIAL CONTROVERSY

The following facts are taken from the Statement of Uncontested Material Facts submitted by the City of Cabot Defendants, the Plaintiff's Statement of Material Facts, and other allegations made by Plaintiff in this action.

At approximately 7:00 p.m., on or about June 20, 2002, the Plaintiff Billy Dodson, called the Lonoke County Sheriff's Office and told officers that he was "going to burn his wife's meth lab." Separate Defendant Cabot Police Officer Jack Fitzhugh arrived on the scene and extinguished the fire. After extinguishing the fire, Officer Fitzhugh recognizing some of the items from the fire as commonly associated with methamphetamine labs and he called Cabot Police Detective Chris Huggins. Detective Huggins came to the scene and examined the items burned by Plaintiff. Detective Huggins contacted Detective John Dodd, also of the Cabot Police Department. Detective Dodd came to the scene.

While present on the premises and when Plaintiff opened the door of the residence to go inside, Officer Fitzhugh observed in plain vew several cans of camp fuel, items commonly

associated with methamphetamine labs, lined up against the far wall of the residence.

Detective Dodd, who is a certified Drug Recognition Expert (DRE) smelled a strong chemical odor he associated with methamphetamine labs. He also noticed a number of items commonly associated with methamphetamine labs, including camp fuel, blister packs from pill boxes, and matchboxes with the strikers removed. It is also alleged that Detective Dodd had independent information that another suspect, who was believed to be another local methamphetamine cook, had recently been in the residence. Detective Dodd had Officer Fitzhugh perform a protective sweep of the premises.

Detective Dodd requested permission from Plaintiff Billy Dodson to search his residence. Plaintiff refused consent. Detective Dodd left the residence before 8:00 p.m. to obtain a warrant to search the residence. Detective Dodd prepared an Affidavit for Search Warrant, relating the above recited facts. Based upon that Affidavit, a judge in the District Court of the City of Cabot, County of Lonoke, Arkansas, found probable cause to believe that items used to manufacture methamphetamine were being concealed on the premises. The judge issued a Search Warrant authorizing the officers to search said premises, located at 506 N. Jackson and any curtilage and also to search vehicles located on the premises.

After obtaining the Search Warrant, Detective Dodd read it prior to its execution. The Search was executed at 8:35 p.m.

Subsequent to the search, Plaintiff was transported to the Cabot jail where he was handcuffed to a bench. Dodson became unruly. After repeated attempts by officers to calm Plaintiff, who pulled on the handcuffs attached to the bench hard enough to pull the bench loose from the wall, Officer Fitzhugh was called back to the jail to assist in controlling Plaintiff. Plaintiff refused to comply with Officer Fitzhugh's attempts to calm him and his warning that he

would be placed in a cell if he failed to calm down. As a result, the police officers placed Plaintiff on the floor and handcuffed him.

Throughout this incident, Plaintiff continued to struggle and to use profanity directed at Fitzhugh. Plaintiff contends that he was injured in the struggle with Fitzhugh, sustaining contact with the concrete floor which caused his forehead and nose to bleed, and also aggravating an old back injury.

Within 24 hours of Plaintiff's arrest, officers from the Cabot jail contacted Lonoke County officials. Dodson was unable to make bail or post bond. Neither Chief Davis nor the City of Cabot set bail amounts. Bail in Lonoke County is set according to a schedule provided to the Cabot Police Department by Lonoke County officials. Neither the City nor Davis had any authority to appoint counsel for Plaintiff.

Although later overturned, Plaintiff was convicted by a jury of the drug related charges brought against him.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when, in reviewing the evidence in the light most favorable to the non-moving party, there is no genuine issue as to any material fact, so that the dispute may be decided solely on legal grounds. *Holloway v. Lockhart*, 813 F.2d 874 (8th Cir. 1987); Fed. R. Civ. P. 56. The Supreme Court has established guidelines to assist trial courts in determining whether this standard has been met:

> The inquiry performed is the threshold inquiry of determining whether there is a need for trial-- whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The Eighth Circuit set out the burdens of the parties in connection with a summary

- 6 -

judgment motion in *Counts v. M.K. Ferguson Co.*, 862 F.2d 1338 (8th Cir. 1988):

> [T]he burden on the party moving for summary judgment is only to demonstrate, i.e., '[to] point[] out to the District Court,' that the record does not disclose a genuine dispute on a material fact. It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion. Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue. If the respondent fails to carry that burden, summary judgment should be granted.

*Id*. at 1339 (quoting *City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 273-74 (8th Cir. 1988) (citations omitted)(brackets in original)).

"A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). However, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Id*.

Once the moving party demonstrates that the record does not disclose a genuine dispute on a material fact, the non-moving party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. Rule 56(e). The plain language of Rule 56(c) mandates the entry of summary judgment against a non-moving party which, after adequate time for discovery, fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322.

## DISCUSSION

In considering Plaintiff Dodson's claims, it is important to remember that it is undisputed

that Mr. Dodson invited the police to his home.  Plaintiff Dodson called 911 reported first that he was going to burn his "old lady's shit" and then that he was going to burn "old lady's meth lab." (Plaintiff's depo. at p. 13, Exh. 1 to Defs.' motion).   In response, an officer was dispatched to the scene.  Thus, the police officers arrived on the scene with probable cause to believe that there was methamphetamine and a methamphetamine lab on the property.

The Court will discuss each of Plaintiff's specific claims of wrongdoing separately.

### A.     The Protective Sweep

Officer Fitzhugh was first on the scene.  When he arrived, a fire was burning outside the residence.  Officer Fitzhugh extinguished the fire, after which he observed empty antihistamine pill boxes, blister packs, match books, three one gallon cans of camp fuel, and assorted coffee filters among the items in the smoldering fire.  (Incident Report, attached to Pl.'s statement). Officer Fitzhugh called Detective Huggins, who came to the scene. Detective Dodd was also called and came to the scene.  During the course of Fitzhugh's contact with Dodson, Dodson entered the house several times.  On at least one occasion when Dodson entered the house, he left the door open.  While the front door was open, Fitzhugh observed several cans of camp fuel (commonly associated with meth labs) inside the house.  (Fitzhugh Aff., at ¶ 12).  Detective Dodd also had information that another suspect, believed to be a methamphetamine "cook" had been in the house over the preceding weeks.  Finally, Dodd, trained as a Drug Recognition Expert, had been trained that methamphetamine labs pose a significant risk of fire and explosion.

At this point, Plaintiff was arrested and a protective sweep of the residence was performed.

It does not appear that the protective sweep produced any evidence.  Nor is there any evidence to suggest that the officers exceeded the permissible scope of the protective sweep.

That is, they did not perform a full search of the premises, but only looked to eliminate immediate danger from an explosion or the presence of other unknown persons.  Finding neither, the officers then proceeded to obtain a search warrant to conduct a full search of the premises.

Defendants argue that the protective sweep conducted by the Defendants of Mr. Fitzhugh's residence did not violate the Fourth Amendment.  On these facts, the Court agrees.  The officers were entitled to sweep the residence to ensure that no danger of fire or explosion existed and also to ensure that no persons were inside the residence who might have posed a significant risk to officers on the scene.

The Supreme Court has approved protective sweeps conducted following an in-home arrest so long as the facts "would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Maryland v. Buie*, 494 U.S. 325, 334, 110 S.Ct. 1093 (1990).  While *Buie* did not specifically address whether officers who made an arrest outside a home would be justified in entering the residence without a warrant to conduct a protective sweep, the justification for allowing police officers to conduct such sweeps is equally compelling.  A number of circuits have specifically addressed this issue and have permitted protective sweeps following an arrest made just outside the home. *See, e.g.*, *U.S. v. Lawlor*, 406 F.3d 37, 41 (1st Cir. 2005)(identifying cases).  As stated by the First Circuit in *Lawlor*,

> We think that an arrest that occurs just outside the home can pose an equally serious threat to arresting officers as one that occurs in the home. Therefore, we accept the position that a protective sweep may be conducted following an arrest that takes place just outside the home, if sufficient facts exist that would warrant a reasonably prudent officer to fear that the area in question could harbor an individual posing a threat to those at the scene.

*Id.*, at 41-42.

Given the circumstances with which the officers in this case were confronted, the Court

- 9 -

concludes that their entry into and cursory inspection of the Plaintiff's residence was reasonable. Because it was reasonable, it did not violate the Fourth Amendment. Plaintiff has failed to bring forward any evidence to justify his claim that the protective sweep was unreasonable or unlawful. Accordingly, the claim will be dismissed as a matter of law.

### B.     The Nighttime Search

Following the protective sweep, Detective Dodd left the premises, obtained a search warrant, returned to the scene with the warrant, and searched Plaintiff's residence. Dodd submitted the Affidavit used to obtain the Search Warrant. The Search Warrant was signed by a judge and supported by adequate cause as a matter of law.

It appears that Plaintiff's only issue with the Search Warrant is that it was executed at nighttime. Plaintiff contends that this violated his rights under the Fourth Amendment. It is undisputed that the search violated Arkansas law requiring that such searches be conducted between 6 a.m. and 8 p.m. The Court concludes that while the nighttime search violated Arkansas state law, it did not violate federal constitutional standards. Accordingly, the City of Cabot Defendants are entitled to judgment as a matter of law on this claim as well.

Arkansas has elected to place more restrictions on the execution of search warrants at night than required by either federal law or by the United State Constitution. For example, the Federal Rules of Criminal Procedure specify that search warrants shall be executed during the daytime, defined as between 6:00 a.m. and 10:00 p.m., unless the issuing magistrate for good cause specifies that the warrant may be executed at a different time. (*See* Rule 41 of the Fed. R. Crim. Pr.).   By rule in Arkansas, warrants may only be executed after 8:00 p.m. upon a finding of exigent circumstances by the issuing magistrate. Arkansas Rule of Criminal Procedure 13.2(c).

The state magistrate who issued the warrant for the search of Plaintiff's home failed to make the required findings that would have justified a nighttime search. The Arkansas Court of Appeals concluded that the execution of the warrant at 8:35 p.m. was a substantial violation of Arkansas law which required the suppression of the evidence seized by the officers who executed the search and used to convict the Plaintiff in a state criminal prosecution. *Dodson v. State, supra*.

The issue in this case is not whether the search violated Arkansas law, but rather, whether the search violated the Federal Constitution, and more specifically, the Fourth Amendment. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."   Considering the totality of the circumstances, there was clearly sufficient probable cause to support the issuance of the warrant. *See Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317 (1983). Thus, the sole issue before this Court is whether the fact that the warrant was executed 35 minutes after Arkansas law permitted the search to be executed makes it "unreasonable" under the Fourth Amendment.

Defendants, in moving for summary judgment regarding the nighttime search, have focused on qualified immunity. The Court, however, finds it more appropriate to first determine whether a constitutional violation occurred. If a constitutional right has not been violated, it is unnecessary to inquire further regarding qualified immunity. *See Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *see also Avalos v. City of Glenwood*, 382 F.3d 792, 798 (8th Cir.2004).

Initially, the Court notes that the search in question would have been valid under federal statutory law. *See, e.g.*, 21 U.S.C. § 879 (drug trafficking search warrant "may be served at any time of the day or night"); and Fed. R. Cr. P. 41(h)(defining daytime "to mean the hours from

6:00 a.m. to 10:00 p.m."). That fact is not dispositive of the constitutional issue, but it makes it less likely that the search will be found unreasonable and unconstitutional.

"The manner in which a warrant is executed is always subject to judicial review to ensure that it does not traverse the general Fourth Amendment proscription against unreasonableness." *Hummel-Jones v. Strope*, 25 F.3d 647, 650 (8th Cir. 1994).[1] In other words, "even valid warrants must be executed in a reasonable manner." *Id.* at 653 (citation omitted). The Defendant officers who executed the warrant were entitled to rely upon the warrant and were obligated not to overstep the limits of the search warrant. The search warrant reads in pertinent part:

**SEARCH WARRANT**

. . .

> YOU ARE HEREBY COMMANDED TO search forthwith the (person)(premises)(vehicle(s)) named for the property specified, serving this warrant and making the search at any time in the (day)(day or night) and if the property be found there to seize it, . . . This warrant to be returned within five (5) days of its execution which shall be within  5  days hereof.

(Search Warrant, Exh. D-2 to Defs.' motion).

It appears that the issuing magistrate failed to note that the warrant was to be issued only in the "day." It does not appear that the officers executed the warrant in a manner that conflicted with what the warrant actually said. In some circumstances, Arkansas law permits search warrants to be executed lawfully at night. (*See* Ark. Cr. P. 13.2(c)(specifying three exigent circumstances)). While being cross-examined during Dodd's criminal trial, Detective Dodd acknowledged that he knew the proper time for executing a search warrant was between 6:00

---

[1] The Court realizes that the determination of <u>how</u> law enforcement officials elected to execute a warrant dovetails to some degree with whether the officials should have understood that their actions violated Plaintiff's rights – the second half of the qualified immunity analysis. The Court's inquiry is made for the sole purpose of determining whether Plaintiff's constitutional rights were violated in the first instance and not as part of a qualified immunity analysis.

a.m. to 8:00 p.m. (Tr. At 9-AB, attached to Pl.'s Statement, Docket No. 85). The record does not explain why Detective Dodd executed the warrant at 8:35 p.m.

Whether Detective Dodd subjectively knew that he was executing the warrant in violation of Arkansas law is not dispositive of the legal issue of whether the search was unreasonable within the meaning of the Fourth Amendment. In assessing the reasonableness of police conduct for purposes of the Fourth Amendment, the Court must apply "objective standards in light of historical facts." *Walker v. Bonenberger*, 438 F.3d 884, 890 (8th Cir. 2006). Accordingly, Officer Dodd's subjective intent is irrelevant to the objective reasonableness standard this Court must apply.

This incident occurred during the Summer, on the evening of June 20, 2002. The Court takes judicial notice that on June 20, 2002, in Cabot, Arkansas, the sunset occurred at 9:26 p.m.,[2] approximately one hour after the Defendant Officers began their search of Plaintiff's residence. Thus, at the time the search began, it was actually under the light of day.

In *Hummel-Jones, supra*, the Eight Circuit held that the officers' decision to execute a search warrant at 2:00 a.m. on a couple and their newborn, hours after the home delivery of the child, in a hostile manner while armed, hostile and arrogant, "exceeded all bounds of reasonableness." *Hummel-Jones*, 25 F.3d at 650.

In stark contrast here, the execution of the search warrant was the natural culmination of the day's events, which Plaintiff himself started when he called 911 to report that he was burning "his wife's" methamphetamine lab.

This Court, after considering the totality of the circumstances, concludes that the

---

[2] A chart is available on the internet from which to compute the actual occurrence of this daily event. (See http://aa.usno.navy.mil/data/docs/RS_OneYear.html).

nighttime search was not unreasonable in violation of the Fourth Amendment. Accordingly, Plaintiff's claims associated with the nighttime search fail as a matter of law.

### C.     Excessive Force Claim

After Plaintiff Dodson was transported to jail, he contends that Officer Fitzhugh jumped on his head and that Officers Tonnessen and Sims assisted Fitzhugh. Thus, Plaintiff asserts excessive force claims against all three Defendants.[3]

Plaintiff Dodson admitted during his deposition to acting unruly and to refusing the officers' request to settle down. Plaintiff's deposition transcript reads in pertinent part:

> Q. Okay. And what happened after your arrival at the jail?
> A. [Billy Dodson]. They put me in the little holding area where the jailers and the dispatchers right there, and then there is a little glass with a holding area and a bench and there are cells around both sides. But they handcuffed me to that bench by the right wrist and told me to sit there. And after a few minutes, I told them it made my back hurt to sit there, and I attempted to get up. I couldn't stand up straight because I was handcuffed to the darn thing, and my handcuffs wasn't long enough – my arm wasn't long enough. So I got kind of belligerent with them, and I started pulling on the bench a little bit. And they told me to quit, and I told them to get blanked, and they called for backup.

(Plaintiff's Deposition, Exh. 1 to Defs.' motion, at pp. 27-28).

Plaintiff acknowledged that he was "already upset" with the officers and that he used profanity with them. (Id. at p. 28). When Officers Fitzhugh and Tonnessen showed up, they asked Plaintiff to settle down, in response to which Plaintiff responded: "I told them to take the blankety-blank handcuffs off, and I would." (*Id*. at 29). At this point, the alleged excessive force actually began when the officers allegedly shoved him down the rest of the way on the floor and Officer Fitzhugh sat on his head while he was still handcuffed. (*Id*.).

---

[3] Dodson previously asserted related claims against the City of Cabot and its police department and Police Chief Jackie Davis. Such claims have already been dismissed. (*See* Order of April 27, 2004, Docket No. 12 in Case No. 4:03-CV-00984).

The undisputed facts demonstrate that Separate Defendants were required to use some force when Plaintiff became belligerent with them, refused to follow their instruction, and used profanity. The reasonableness of a particular use of force depends on the circumstances of each case and must be assessed from the vantage point of a "reasonable officer on the scene, not the 20/20 vision of hindsight." *Wertish v. Krueger*, 433 F.3d 1062, 1066 (8th cir. 2006). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the fourth amendment." *Graham v. Connor*, 490 U.S. 386 (1989)(*quoting Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary." *Graham, supra*, at 396-97.

In analyzing Plaintiff's excessive force claim, the Court must also consider the nature and scope of the injuries, if any, caused by the alleged excessive force. The Eighth Circuit has held that an "actual injury" must be shown to support an excessive force claim under the Fourth Amendment. *Hanig v. Lee*, 415 F.3d 822, 824 (8th Cir. 2005).

As a result of the alleged excessive force, Dodson claims to have suffered two injuries: (1) a "concrete burn" to his nose and forehead allegedly inflicted by officers; and (2) aggravation of a back injury. With regard to the concrete burn, Dodson never saw a doctor or requested to see a doctor about it. He candidly admitted that it was "just a [sic] aggravation more than anything[.]" (*Id.*, at 33-34). Dodson also admitted that any bruises on his arms were the result of his own actions in pulling against the handcuffs. (*Id.*, at 41). On this record, only the aggravation of the back injury could potentially rise to the level of an actual injury.

Prior to the alleged excessive force, Plaintiff suffered an injury to his back as a result of an

- 15 -

automobile accident.    In his deposition, Plaintiff Dodson stated:

> Q. . . Do you think that any injury was actually caused to your back by this?
> A. [by Dodson]: No, it's just aggravated a preexisting condition.  And its got a compression fracture of three vertebras back there.
> Q. But that's the preexisting condition; right?
> A. [by Dodson]: Uh-huh.
> Q. How did that happen?
> . . .
> A. [by Dodson]: Automobile accident.

(*Id*. at 35).

To control the associated back pain, Plaintiff took Darvon, a prescription pain medicine, prior to his arrest.   In fact, he had taken Darvon on the day of his arrest.  Following the alleged excessive force, Plaintiff continued to take pain medicine for his back.  (*Id.*, at 33-35).

Although Plaintiff claims to have suffered an aggravation of the back condition, there is no evidence that his back was worse following the alleged excessive force.  The fact that Plaintiff's back may have been sore after the struggle will not suffice to prove an "actual injury."   Plaintiff has not come forward with any evidence or medical testimony to permit a finding that his back condition was worse after the incident.  Nor has Plaintiff offered any evidence to show that he suffered any long-term or permanent injury due to the incident.  *See Foster v. Metropolitan Airports Commission*, 914 F.2d 1076, 1082 (8th Cir. 1990)("nerve damage" from being handcuffed too tightly did not constitute actual injury without "medical records indicating . . . any long-term injury as a result of the handcuffs.").

On these facts, the Court concludes that no constitutional violation occurred.  Plaintiff admits that he was belligerent, refused to follow directions, and used profanity at the officers, who were therefore called upon to use some force to control him.  There are no facts other than Plaintiff's blanket assertion to suggest that the force employed was greater than that necessary to subdue Plaintiff.  Because some force was reasonably required, the Court concludes that

Plaintiff's minor scrapes and what appears to be a less than permanent aggravation of a prior back injury were de minimis injuries that support the conclusion that the Separate Defendants did not use excessive force. *See Wertish supra* at 1067; *Andrews v. Fuouss*, 417 F.3d 813, 818 (8th Cir. 2005); *Crumley v. City of St. Paul*, 324 F.3d 1003, 1007 (8th Cir. 2003)("a de minimis use of force or injury is insufficient to support a finding of a constitutional violation").

Plaintiff's excessive force claim fails as a matter of law.

### D.     Excessive Bail and Lack of Counsel

Because neither the City of Cabot nor the Police Chief Jackie Davis set bail amounts, neither can be held liable for Dodson's allegedly excessive bail amount.

Because neither the City of Cabot nor the Police Chief Jackie Davis appointed Plaintiff's public defender or had the authority to control such appointment, neither can be held liable in connection with Dodson's claims regarding inadequate and late appointment of counsel.

### CONCLUSION

For the reasons herein stated,

IT IS FURTHER ORDERED THAT the Motion for Summary Judgment (Docket No. 80) filed by Separate Defendants Edward Sims, Jr., Roger Tonnessen, Jacks Fitzhugh, Chris Huggins, Jackie Davis, John Dodd, and the City of Cabot, Arkansas, be and it is hereby, GRANTED.

IT IS FURTHER ORDERED THAT the Motion to Deem Admitted (Docket No. 69) be, and it is hereby, DENIED AS MOOT in light of the fact that the Court did not rely on said admissions in ruling on the summary judgment motion.

IT IS FURTHER ORDERED THAT the Motion to Dismiss (Docket No. 76) filed by Separate Defendants Edward Sims, Jr., Roger Tonnessen, Jacks Fitzhugh, Chris Huggins, Jackie Davis, John Dodd, and the City of Cabot, Arkansas  be, and it is hereby, DENIED AS MOOT.

IT IS SO ORDERED this   12th   day of June, 2006.

                                          ___/s/Garnett Thomas Eisele_____
                                          UNITED STATES DISTRICT COURT